IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


DEBRA J. GOFF                                                    PLAINTIFF


        v.                          CIVIL NO. 04-2213


JO ANNE B. BARNHART, Commissioner
Social Security Administration                                  DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

        Plaintiff Debra J. Goff brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial

review of a decision of the Commissioner of Social Security (Commissioner) finding she is no

longer entitled to disability benefits under the provisions of Title XVI of the Social Security Act

as of April 1, 2002, due to a medical improvement.

### Procedural Background:

        Plaintiff filed an application for supplemental security income (SSI) benefits on

November 12, 1996, alleging an inability to work since September 1, 1996, due to hypertension,

borderline intellectual functioning and depression. (Tr. 36-40). By a written decision of an ALJ

dated June 21, 1998, plaintiff was found to be disabled and entitled to SSI. (Tr. 141-144).

        A continuing disability review was initiated in January of 2002. (Tr. 160-161). A

determination was made that plaintiff's disability had ceased as of April 1, 2002, and that her

entitlement to SSI would end as of June of 2002. (Tr. 162-164).

        Plaintiff filed a request for reconsideration. (Tr. 167-168). In a written decision dated

May 16, 2003, a disability hearing officer (DHO) determined that due to a medical improvement,

plaintiff was no longer disabled and that she was able to perform unskilled, medium work. (Tr. 176-180).

Plaintiff requested a hearing before an ALJ, which was held on October 28, 2003. (Tr. 481-519). Plaintiff was informed of her right to representation but chose to proceed with the hearing on her own. (Tr. 516-517).

In a written decision dated May 11, 2004, the ALJ found plaintiff had experienced a medical improvement related to her ability to work. (Tr. 19). The ALJ further found plaintiff retained the residual functional capacity (RFC) to lift twenty-five pounds frequently, fifty pounds occasionally; to push/pull the same amounts; to sit, stand and walk a total of six hours each in an eight-hour workday with regular breaks. (Tr. 19). The ALJ further found plaintiff must avoid working at unprotected heights and around unprotected moving machinery. (Tr. 19). From a mental standpoint, the ALJ found plaintiff can understand, remember and carry out more detailed instructions with some limitations; and that she is limited to unskilled work, as defined by the ability to perform work where interpersonal contact is incidental to work performed, complexity of tasks is learned and performed by rote with few variables and little judgment and supervision is simple, direct and concrete. (Tr. 19). With the help of vocational expert testimony, the ALJ found plaintiff was able to perform were past relevant work as an inspector at a furniture factory. (Tr. 20).

Plaintiff appealed the decision of the ALJ to the Appeals Council. Plaintiff's request for review of the hearing decision by the Appeals Council was denied on July 28, 2004. (Tr. 5-7). When the Appeals Council declined review, the ALJ's decision became the final action of the Commissioner. Plaintiff now seeks judicial review of that decision. (Doc. #1). Plaintiff filed a

2

letter brief on April 18, 2005.[1] (Doc. # 11). Defendant filed an appeal brief on May 9, 2005.

(Doc. # 12). The case is before the undersigned for report and recommendation.

**Evidence Presented:**

At the time of the administrative hearing on October 28, 2003, plaintiff was fifty years

of age and obtained an eighth grade education. (Tr. 488). Plaintiff testified she was able to read

and write and do basic arithmetic. (Tr. 489). With regard to working, plaintiff testified she had

worked for a furniture factory inspecting baby beds and then she had baby-sat for different

people off and on. (Tr. 490).

When asked why she is unable to work, plaintiff testified her left knee gives way a lot,

she gets dizzy when she walks and she experiences chest pain every once in a while. (Tr. 493,

497-498). Plaintiff testified that she takes medication which helps with her depression. (Tr. 494).

Plaintiff testified her back pain had been relieved with steroids. (Tr. 496). Plaintiff explained

that she had an appointment for a second steroid shot but she did not think she would need it.

Plaintiff testified that her diabetes was under fairly good control, but she had one incident where

her blood sugar was too low and she passed out. (Tr. 499, 501). Plaintiff indicated medication

was also helping to treat her high blood pressure. (Tr. 502).

On an average day, plaintiff testified she cleans her house, walks her dog, watches

television, works on plastic canvas and colors in coloring books. (Tr. 503, 508). Plaintiff

testified that she usually goes to church every Sunday but noted she had not gone for the past two

---

[1]We note that plaintiff proceeds pro se in this action and while she did submit a letter brief she did not cite any specific error on the part of the Commissioner. However, under 42 U.S.C. § 405(g), all that is necessary to trigger judicial review is the filing of a complaint and transcript. We then review the entire decision to ensure that there are no legal errors and that the findings of fact are supported by substantial evidence. *Kenney v. Heckler*, 577 F. Supp. 214, 216 (N.D. Ohio 1983).

3

or three weeks. (Tr. 509). Plaintiff testified she also reads the Bible and Christian books. Plaintiff also goes to visits friends and has friends come to her house to visit. Plaintiff also thought if she could find a job she would be able to work part-time. (Tr. 510). Plaintiff testified that she can sit for a long period of time, can stand and walk but does have problems with occasional dizziness and can lift things that are not real heavy.

Mr. Edward Goff, plaintiff's husband, testified plaintiff's dizziness caused her to fall once but he could not remember where and when this occurred. (Tr. 506).

Mr. Dale Thomas, a vocational expert, testified plaintiff's past relevant work as an inspector at a furniture factory is considered light, unskilled work. (Tr. 513). After listening to the ALJ's hypothetical question (Tr. 513-514), Mr. Thomas testified the hypothetical individual would be able to perform her past relevant work. (Tr. 514).

The pertinent medical evidence in this case reflects the following. On August 25, 2000, plaintiff reported that her medications were making her nauseated. (Tr. 286). Dr. Syed A. Hamid noted plaintiff was started on Paxil on August 1, 2000. Plaintiff reported that the medication did help with her anxiety but she also thought it caused diarrhea. Dr. Hamid noted plaintiff's blood sugars were under control. Upon examination, Dr. Hamid noted there was a postural drop in plaintiff's blood pressure and that plaintiff felt dizzy getting up. Dr. Hamid diagnosed plaintiff with nausea and diarrhea, most likely from a viral gastroenteritis, severe dehydration due to poor oral intake, hypertension, fairly well controlled non-insulin dependent diabetes mellitus (NIDDM) and status post colon resection for colon cancer in 1999. Plaintiff was instructed to discontinue the Paxil and to eat a soft diet and drink plenty of fluids.

4

Plaintiff returned to Dr. Hamid's office for a follow-up appointment on August 30, 2000. (Tr. 285). Plaintiff reported her diarrhea was better but she continued to be nauseous and dizzy. Upon examination, Dr. Hamid noted plaintiff's blood pressure was 128/86. He noted she was still orthostatic and that plaintiff still complained of dizziness upon getting up. Plaintiff was diagnosed with gastroenteritis. Due to plaintiff's dehydration, Dr. Hamid also instructed plaintiff to continue oral hydration.

On September 1, 2000, plaintiff reported she had been drinking more fluids and was doing a lot better. (Tr. 284). Dr. Hamid noted plaintiff's gastroenteritis symptoms were gone, that plaintiff's blood sugars were running very low and that her hypertension was controlled. Dr. Hamid recommended decreasing her does of Glucophage and to contact him if her blood sugars started running higher than 120.

On October 24, 2000, Dr. Hamid noted plaintiff's blood sugar was under control. (Tr. 283). Plaintiff reported she was attending diabetic school and controlling her dietary intake. Dr. Hamid noted plaintiff's blood pressure had started to drop since she was paying attention to her salt intake. Dr. Hamid diagnosed plaintiff with well controlled NIDDM and controlled hypertension.

Progress notes dated January 8, 2001, report plaintiff's chemotherapy to treat Duke C carcinoma of the colon in April of 2000. (Tr. 311). Plaintiff reported her most significant problem is a recurrent urethral stone. Ms. Aida Jones, ANP, indicated that in terms of her cancer she was doing well. Ms. Jones recommended plaintiff follow-up with Dr. Akkad.

Progress notes dated January 22, 2001, report plaintiff's blood sugars increased due to plaintiff's weight gain. (Tr. 282). Plaintiff also complained of dizziness off and on usually

5

occurring when she blood pressure increased. Plaintiff was diagnosed with poorly controlled NIDDM due to weight increase. Her medications were changed and she was to call in with her blood pressure in a week.

On March 12, 2001, plaintiff underwent a hepatobiliary scan with evaluation of the gallbladder ejection fraction. (Tr. 359-360). The scan showed a normal hepatobiliary study with no evidence of acute cholecystitis and a normal gallbladder ejection fraction.

Progress notes on May 7, 2001, reported plaintiff was in for a follow-up of her Dukes C carcinoma of the colon. (Tr. 305-306). Plaintiff reported that she had seen Dr. Akkad for abdominal pain in March and underwent testing that was normal. At the time of this evaluation she reported the pain had disappeared. Plaintiff complained of periods of tiredness and weakness. Ms. Jones encouraged plaintiff to increase her activity as much as she could tolerate. Ms. Jones noted there was no recurrence of cancer.

Progress notes dated May 10, 2001, report plaintiff was in for a follow-up appointment to check her blood sugar. (Tr. 281). Dr. Hamid noted plaintiff's blood sugar was fluctuating between 150 and 200. Plaintiff was diagnosed with NIDDM poorly controlled due to diet. Glucophage was added to plaintiff's medications.

On June 5, 2001, plaintiff complained of chest pain not related to activity. (Tr. 279). An EKG was normal. Plaintiff was instructed to rest and to call back in two to three days.

On June 8, 2001, plaintiff reported she continued to have chest pain. (Tr. 278). Plaintiff was diagnosed with anterior chest wall pain and started on Darvocet.

On June 19, 2001, plaintiff underwent a stress test that showed borderline positive stress electrocardiogram, without symptoms. (Tr. 357-358).

AO72A
(Rev. 8/82)

On June 25, 2001, plaintiff reported her chest pain improved a lot with Darvocet but has not completely relieved. (Tr. 277). Plaintiff was scheduled to undergo a stress test and a scan on July 2nd. Plaintiff was instructed to rest and to avoid caffeine and nicotine.

On July 2, 2001, plaintiff complained of left sided back pain. (Tr. 276). Plaintiff was given Robaxin and instructed to rest and to use heat and massage.

On this same date, plaintiff underwent a myocardial perfusion scan which revealed minimal localized decrease in perfusion in the anterior wall of the left ventricle, present on both stress and resting images. (Tr. 355). No segmental wall motion abnormalities were noted and her ejection fraction of sixty-six percent.

Progress notes dated July 10, 2001, report plaintiff's complaints of chest discomfort, exertional dyspnea and hot flashes. (Tr. 275). Due to her continued chest pain plaintiff was started on Mobic on July 24, 2001. (Tr. 274).

On August 2, 2001, plaintiff presented to the Sparks Regional Medical Center complaining of a near-syncope episode two days ago and chest pain. (Tr. 347-353). The clinical impression made was dizziness and chest wall pain. (Tr. 349).

On August 31, 2001, presented to Dr. Holly Heaver Jennings office as a transfer from Dr. Ahmad. (Tr. 319-320). Plaintiff reported she had NIDDM and that she had been waking up in the middle of the night with night sweats for about the past two months. Plaintiff reported she documented her blood sugars during her night sweats and they are generally between 55 and 70. Plaintiff reported her blood sugars during the day are generally between 125 and 140. After examining plaintiff, Dr. Jennings diagnosed plaintiff with NIDDM, hypertension, night sweats

7

and status post TAH-BSO, not on hormone replacement therapy. Plaintiff was scheduled to undergo blood tests, a bilateral mammogram and a DEXA scan.

Progress notes dated September 4, 2001, returns for a follow-up of Duke's C carcinoma of the colon. (Tr. 301-302). After examining plaintiff, Ms. Jones encouraged plaintiff to keep her appointment with Dr. Akkad and to continue to have her period colonoscopy as indicated.

Plaintiff underwent a DEXA scan on September 11, 2001. (Tr. 329). Dr. Raymond de la Rosa found no evidence of osteoporosis or osteopenia of the lumbar spine and hip.

On October 17, 2001, plaintiff underwent a colonoscopy which revealed no evidence of recurrent cancer. (Tr. 340-346).

On November 2, 2001, plaintiff returned to Dr. Jennings office for a follow-up appointment. (Tr. 317). Plaintiff reported a new problem of a left-sided lumbar spasm. Plaintiff reported spasm a few days the week before, but it had not bothered her during the past week. Plaintiff also reported a numb feeling in her right hand. In terms of plaintiff's NIDDM, Dr. Jennings noted plaintiff was doing very well but did have an occasional outlier blood sugar. Plaintiff's blood pressure was also noted to be well controlled. Dr. Jennings recommended plaintiff undergo EMG and NCV of the right upper extremity.

On November 13, 2001, plaintiff underwent EMG and NCV studies of the right upper extremity. (Tr. 290-291). The test results revealed no evidence of carpal tunnel or problems on the right. Dr. Duane L. Birky noted plaintiff's nerve conduction fell within normal limits but the needle exam on the left revealed an abnormality in one muscle only, likely representing a left chronic C7 radiculopathy.

AO72A
(Rev. 8/82)

Plaintiff returned for a follow-up of her Duke's C carcinoma of the colon on January 15, 2002. Ms. Jones noted plaintiff underwent a colonoscopy in October of 2001, and no evidence of recurrent disease was noted. Plaintiff reported she developed pain in her right mid quadrant about a week ago and was being treated by Dr. Akkad for possible cholecystitis.

Progress notes dated January 4, 2002, report plaintiff's overall blood sugars have improved. (Tr. 315). Dr. Jennings opined plaintiff's blood sugar could be improved and her medication was adjusted.

Progress notes dated January 21, 2002, report plaintiff's complaints of right flank pain. (Tr. 294). Dr. John L. Lange recommended cysto with holmium laser fulguration of a right renal stone.

Progress notes dated February 5, 2002, report plaintiff's blood sugars were ranging from 88 to 135. (Tr. 314). Plaintiff reported she had not had any outliers or hypoglycemic episodes. Plaintiff reported she was feeling fine. Dr. Jennings noted plaintiff's improved control of her NIDDM and controlled hypertension.

On February 20, 2002, plaintiff entered the Sparks emergency room complaining of abdominal and right flank pain. (Tr. 335-339). Plaintiff underwent a stent placement and was discharged in home in improved condition. (Tr. 337, 339).

Plaintiff returned to the Sparks emergency room complaining of abdominal and right flank pain in February 22, 2002. (Tr. 332). Plaintiff was given medication and discharged home in improved condition.

On March 27, 2002, plaintiff underwent a mental status examination performed by Dr. Patricia J. Walz. (Tr. 361-364). Dr. Walz noted plaintiff arrived on time and her grooming and

hygiene were appropriate. (Tr. 361). At the time of the evaluation, plaintiff was taking Premarin, Atenolol, Glucovance, Amilor/HCTZ, Captopril and Calcium. Plaintiff reported no current or past psychiatric illness and that she had not undergone psychiatric hospitalization or counseling or taken psychotropic medication. Plaintiff reported that she did "pretty well" in school up until the ninth grade. She also reported she was in special education classes and had attended an adult education class.

Dr. Walz noted plaintiff was cooperative and her vocabulary was limited. Plaintiff's thinking was logical and goal oriented but concrete in nature. Plaintiff reported she did not sleep well and described her energy level as "sometimes I [am] tired and sometimes I can get up and go all day." Plaintiff reported no problems with memory or concentration but she did feel depressed sometimes. Dr. Walz noted previous testing indicated plaintiff's IQ was in the borderline range and she agreed with these findings. (Tr. 363). Dr. Walz diagnosed plaintiff with dysthmia and borderline intellectual functioning.

With regard to adaptive functioning, Dr. Walz again noted plaintiff's limited vocabulary. As for plaintiff's social functioning, plaintiff reported she had a lot of friends and that she gets along with her neighbors. Plaintiff reported leaving the home several times a week to purchase groceries. Plaintiff also reported going to help her husband's 84 year old cousin a couple of times a week. Plaintiff reported she did not need assistance with her activities of daily living and that she did most of the cleaning in her home. Plaintiff also reported that she "puttered" in the flower garden. To pass the time, plaintiff reported she worked puzzle books, colored, did sewing crafts and worked with plastic canvas. Dr. Walz found plaintiff's concentration, persistence and pace to be appropriate. Dr. Walz also opined plaintiff probably had problems in academic functioning.

10

While Dr. Walz did not think plaintiff could handle a complex budget, she did feel plaintiff could handle her small check.

On April 11, 2002, Dr. Kathryn M. Gale completed a mental RFC assessment stating that plaintiff has moderate limitations in the following areas: in her ability to understand and remember detailed instructions; in her ability to carry out detailed instructions; in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and in her ability to interact appropriately with the general public. (Tr. 379-382). Dr. Gale concluded that plaintiff is able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; and supervision required is simple, direct and concrete. (Tr. 381). Dr. Gale also completed a psychiatric review technique form indicating plaintiff had mild restrictions of her activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration. (Tr. 365-378).

On April 11, 2002, Dr. Alice Davidson, a non-examining, medical consultant, completed a RFC assessment stating that plaintiff, could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that no postural, manipulative, visual, communicative or environmental limitations were evident. (Tr. 383-390).

AO72A
(Rev. 8/82)

On May 1, 2002, plaintiff complained of a three day history of low back pain. (Tr. 480). Plaintiff reported her back bothered her most when she bent over. Plaintiff also wanted a recent tick bite to be examined. Dr. Jennings noted plaintiff was doing well in regard to her NIDDM and hypertension. Upon examination, Dr. Jennings noted straight leg raise was negative bilaterally and her deep tendon reflexes were 2+ and symmetric at the knees and ankles bilaterally. Plaintiff's lower extremity muscle strength was intact bilaterally. Dr. Jennings diagnosed plaintiff with lumbar spasm, a tick bite and NIDDM. Plaintiff was given a Zanaflex prescription for muscle spasms and instructed to continue with her present medications.

Progress notes dated June 5, 2002, report plaintiff's complaints of an overall feeling of not feeling well. (Tr. 477). Plaintiff reported she simply did not feel like she wanted to do anything with friends and family. Dr. Jennings opined that plaintiff seemed to be suffering from depression rather than from anything else. Dr. Jennings noted plaintiff's blood sugars had been "quite good" and her blood pressure had been well controlled. Dr. Jennings started plaintiff on Zoloft and instructed her to follow-up in one month.

On July 3, 2002, plaintiff returned for a follow-up for her depression. (Tr. 476). Plaintiff reported that she felt as if she had improved a great deal on Zoloft but thought there was room for improvement. Dr. Jennings noted plaintiff's NIDDM was stable and her hypertension was controlled. Dr. Jennings increased plaintiff's Zoloft dosage to 100 mg.

On July 9, 2002, plaintiff reported she had fallen while walking her dog the previous day and had struck the right parietal area of her head on a rock. (Tr. 475). Plaintiff did not lose consciousness but she did have a headache. Plaintiff denied experiencing any visual disturbances, nausea or vomiting. Because plaintiff had a normal neurological examination and no loss of

12

consciousness, Dr. Jennings did not think a CT scan was necessary. Plaintiff also showed Dr. Jennings a wound on her knee that occurred while she was walking her dog. Plaintiff reported her knee gave out and she struck a rock. Dr. Jennings noted the wound appeared to be healing well. Plaintiff was instructed to let her know if her wound had not completely healed within the next two weeks.

On July 19, 2002, plaintiff complained that her knee was not healing properly. (Tr. 474). Dr. David A. Dias cleaned plaintiff's wound and instructed her to do the same twice a day. He also started plaintiff on Amoxicillin.

On July 23, 2002, plaintiff returned to Dr. Jennings office for a follow-up to an abrasion on her left knee. (Tr. 473). Dr. Jennings noted plaintiff's blood sugars continued to be excellent, ranging from 99 to 130. Dr. Jennings noted that plaintiff's abrasion appeared to be somewhat pussy. Plaintiff was instructed to continue cleaning the wound twice a day. Dr. Jennings discontinued the use of Amoxicillin and started plaintiff on Cipro.

On September 4, 2002, plaintiff complained of pain around her knees, hips and lower back. (Tr. 472). Plaintiff had been aware of the pain for several days and had not used any over-the-counter medication. After examining plaintiff, Dr. Jennings diagnosed plaintiff with osteoarthritis of the knees and hips, NIDDM, hypertension and history of Duke C carcinoma of the colon status post hemicolectomy and chemotherapy. Plaintiff was scheduled to undergo bilateral mammograms and a colonoscopic follow-up with Dr. Masri. Dr. Jennings recommended plaintiff use over-the-counter Aleve for her osteoarthritis.

On October 18, 2002, plaintiff complained of right hand/arm pain. (Tr. 471). Dr. Dias noted that it was very obvious that she had a positive Phalen and Tinel sign. Dr. Dias noted the

13

first three and a half fingers were involved. Plaintiff was diagnosed with carpal tunnel syndrome and placed her in a cock up wrist splint. Dr. Dias scheduled plaintiff for nerve conduction studies and gave plaintiff Celebrex.

On November 4, 2002, Dr. Robert M. Redd, a non-examining, medical consultant, completed a RFC assessment stating that plaintiff, could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that no postural, manipulative, visual, communicative or environmental limitations were evident. (Tr. 393-400).

Plaintiff underwent nerve conduction study on November 21, 2002. (Tr. 469-470). The study was normal and there was no evidence of a nerve entrapment syndrome.

On January 10, 2003, plaintiff complained of nausea for the past several weeks. (Tr. 468). Dr. Jennings noted this was the first time plaintiff's has had a blood pressure elevation of this significance. Otherwise, the plaintiff was doing well. Dr. Jennings recommended a trial of Metoclopramide and updating diabetic related laboratories. If plaintiff's blood pressure remained elevated, Dr. Jennings was going to consider increasing her Captopril dosage. Due to plaintiff's continued blood pressure elevation, plaintiff's Captopril was increased on January 20, 2003. (Tr. 464). She was also started on Erythromycin to treat her diabetic gastroparesis.

On February 17, 2003, plaintiff underwent a second mental status evaluation performed by Dr. Walz. (Tr. 403-407). Plaintiff reported " I think I could probably go to work if I wanted to. I do [not] think there [is] anything to keep me from working. I had to take care of my mother-in-law but she died in 1998." Plaintiff reported she went through a brief period of depression

14

the previous year but Zoloft was helping. Plaintiff reported that her reading abilities were pretty good. She likes reading mysteries and science fiction novels. Plaintiff also reported doing okay with addition and subtraction. Plaintiff reported no problems with memory or concentration. Plaintiff reported that she feels depressed sometimes and admitted to occasional thoughts of wishing she were dead but has never made a suicide attempt. After examining plaintiff, Dr. Walz estimated plaintiff's IQ was in the low seventies. She diagnosed plaintiff with major depression, single episode with psychosis, dysthmia and borderline intellectual functioning.

With regard to adaptive functioning, Dr. Walz noted plaintiff had a slight lisp due to poor dentition. As for plaintiff's social functioning, plaintiff reported she had a lot of friends and that she gets along with her neighbors. Plaintiff reported she was going to church regularly but now has no transportation. Plaintiff reported leaving the house three or four times a week to see her husband's cousin. Plaintiff reported she did not need assistance with her activities of daily living and cleans her home when she is not tired. Plaintiff reported that she planned to plant some flowers when the weather turned warmer. To pass the time, plaintiff reported she worked puzzle books, colored, did sewing crafts, worked with plastic canvas and watched television. Dr. Walz found plaintiff's concentration, persistence and pace to be appropriate. Dr. Walz also opined plaintiff probably had problems in academic functioning. Dr. Walz did not think plaintiff could handle her own finances.

On March 4, 2003, Dr. Brad Williams completed a mental RFC assessment stating that plaintiff has moderate limitations in the following areas: in her ability to understand and remember detailed instructions; in her ability to carry out detailed instructions; in her ability to maintain attention and concentration for extended periods; in her ability to complete a normal

15

workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; in her ability to accept instructions and respond appropriately to criticism from supervisors; and in her ability to set realistic goals and make plans independently of others. (Tr. 422-425). Dr. Williams concluded that plaintiff is able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; and supervision required is simple, direct and concrete. (Tr. 424). Dr. Williams also completed a psychiatric review technique form indicating plaintiff had mild restrictions of her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration. (Tr. 408-421).

Progress notes dated April 29, 2003, report plaintiff's complaints of left lower extremity pain. (Tr. 461). Dr,. Jennings noted plaintiff was tolerating the erythromyacin. She noted plaintiff had not increased her blood pressure medication as instructed and her blood pressure had increased. Plaintiff's blood sugars were noted to be great.

On May 30, 2003, plaintiff reported she was feeling fatigued but had been active. (Tr. 460). She denied dizziness or headaches. Plaintiff's blood pressure was noted to be under good control. Plaintiff reported she was still experiencing leg pain.

On June 11, 2003, plaintiff complained of low back, left hip and left leg pain for the past month. (Tr. 429-432). X-rays of plaintiff's lumbar spine showed moderate degenerative disc disease with vacuum disc phenomenon at L5-S1 with mild to moderate changes otherwise throughout the lumbar spine. There was no evidence of fracture or spondylolosthesis. After

16

examining plaintiff, Dr. Thomas E. Cheyne diagnosed plaintiff with lumbar radiculopathy with underlying degenerative disc disease at L5-S1. Dr. Cheyne recommended plaintiff undergo a MRI scan, that she continue her Clinoril and that she use hot bathes twice daily.

On June 17, 2003, plaintiff underwent a MRI of the lumbar spine which showed degenerative disc disease with some mild bulging at the lower two levels with no significant central or foraminal stenosis. (Tr. 427).

Plaintiff returned to Dr. Cheyne for a follow-up on June 25, 2003. (Tr. 426). Plaintiff reported she continued to have significant symptoms. Dr. Cheyne temporarily stopped plaintiff's Clinoril and put her on Medrol-Dosepak. Once she completed the Dosepak, plaintiff was to resume taking Clinoril. Dr. Cheyne recommended plaintiff continue hot showers and that plaintiff stay active but protective of her back.

On September 20, 2003, plaintiff entered the Sparks emergency room complaining of chest pain, nausea, vomiting and diarrhea. (Tr. 449-451). An electrocardiogram demonstrated normal sinus rhythm with a nonspecific T-wave abnormality. (Tr. 435). Plaintiff was admitted to a telemetry bed. A chest x-ray showed no acute disease. (Tr. 440). On September 22nd, plaintiff underwent a myocardial perfusion study which showed a normal stress test, a normal gated SPECT study, no evidence of perfusion defects in any segment of the left ventricle during stress or rest and an ejection fraction of sixty-three percent. (Tr. 437-438). Plaintiff was discharged on this date with instructions to follow-up with Dr. Jennings in two to four weeks. (Tr. 452).

On September 30, 2003, plaintiff complained of chest pain, increased blood pressure and increased blood sugars. (Tr. 459). Dr. Jennings diagnosed plaintiff with atypical chest pain, hypertension and NIDDM. She made adjustments to plaintiff's medications and scheduled

17

plaintiff for a CT scan of the chest. Plaintiff underwent the CT scan on October 13, 2003, and the results were normal. (Tr. 458).

On October 3, 2003, plaintiff had a hypoglycemic episode while she was at a store. Emergency services were dispatched. (Tr. 453-454). After drinking orange juice and eating cake plaintiff's blood sugar rose. Plaintiff did not want further evaluation and was advised to go and eat and was left in the care of her husband.

Progress notes dated October 29, 2003, report plaintiff's complaints of chest pain and possible GERD. (Tr. 457). After examining plaintiff, Dr. Jennings diagnosed plaintiff with atypical chest pains and possible GERD. Dr. Jennings recommended plaintiff take Prevacid. She further recommended plaintiff undergo a colonoscopy.

## Discussion:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the

18

evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

The initial, crucial question in a case such as this is whether the claimant's condition has improved since the prior award of disability benefits. *Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991). "The claimant in a disability benefits case has a `continuing burden' to demonstrate that [she] is disabled, . . . and no inference is to be drawn from the fact that the individual has previously been granted benefits." *Id.* (internal citation omitted); 42 U.S.C. § 423(f). If a claimant meets this initial burden, the responsibility then shifts to the Commissioner to demonstrate that the claimant is not disabled. *Id.* (citing *Lewis v. Heckler*, 808 F.2d 1293, 1297 (8th Cir. 1987)). "If the government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvements in the physical condition are related to claimant's ability to work." *Nelson*, 946 F.2d at 1315; 20 C.F.R. § 404.1594 (b)(2)-(5).

According to regulations promulgated by the Commissioner, "medical improvement" is defined as any decrease in the medical severity of an impairment which was present at the time of the most recent favorable medical decision that the individual was disabled or continued to be disabled. 20 C.F.R. § 416.994(b)(1); *Nelson,* 946 F.2d at 1315-1316. A determination that there has been a decrease in medical severity must be based on changes in symptoms, signs, and/or laboratory findings associated with the impairment. *Id.* Medical improvement is related

19

to the ability to do work if there has been a decrease in the severity of the impairment and an increase in the individual's ability to do basic work activities. *Id.* at § 404.1594(b)(3).[2]

In the present case, the ALJ found that plaintiff has severe impairments. The ALJ found that plaintiff's impairment, or combination of impairments, do not meet or equal a Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. The ALJ found that the medical evidence establishes that plaintiff has experienced a decrease in the signs, symptoms and/or laboratory findings related to plaintiff's impairments since May 21, 1998, the date of the plaintiff's most recent favorable decision, which demonstrates medical improvement in her condition. The ALJ further found that this medical improvement in plaintiff's condition is related to her ability to work. The ALJ concluded that as of April 1, 2002, plaintiff possessed the RFC to lift twenty-five pounds frequently, fifty pounds occasionally; to push/pull the same amounts; to sit, stand and walk a total of six hours each in an eight-hour workday with regular breaks. The ALJ further found plaintiff must avoid working at unprotected heights and around unprotected moving machinery. From a mental standpoint, the ALJ found plaintiff can understand, remember and carry out more detailed instructions with some limitations; and that she is limited to unskilled work, as defined by the ability to perform work where interpersonal contact is incidental to work performed, complexity of tasks is learned and performed by rote

---

[2]Pursuant to the regulations, the Commissioner is required to follow specific steps in determining whether disability continues. The steps are: (1) Is the individual engaging in substantial gainful activity (SGA)(2) Does the individual have an impairment which meets or equals the severity of an impairment listed in Appendix 1? (3) Has there been medical improvement? (4) If there has been medical improvement, is it related to the ability to work? (5) Do any exceptions to the medical improvement standard apply if there has not been a medical improvement or if the improvement is not related to the ability to work? (6) Does the individual have a severe impairment or combination of impairments? (7) Can the individual do past relevant work? (8) Can the individual do any other work? 20 C.F.R. § 404.1594(f).

AO72A
(Rev. 8/82)

with few variables and little judgment and supervision is simple, direct and concrete. With the help of vocational expert testimony, the ALJ found plaintiff was able to perform her past relevant work as an inspector at a furniture factory. We believe there is substantial evidence of record supporting the ALJ's determination.

As to plaintiff's current subjective complaints, the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), and there is substantial evidence supporting the ALJ's determination that plaintiff's complaints that her medical condition continues to be disabling were not credible.

The medical evidence in this case establishes plaintiff has been consistently treated for NIDDM and hypertension. The records indicate plaintiff had occasional elevated blood sugars and blood pressure; however, with a few adjustments to her medications and plaintiff's compliance in taking the medication as instructed these conditions have been controlled. *See Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (citations omitted) (an impairment which can be controlled by treatment or medication is not considered disabling).

In September of 2002, plaintiff was diagnosed with osteoarthritis of the knees and hips. Dr. Jennings instructed her to use over-the-counter medication such as Aleve. *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) ( lack of strong pain medication was inconsistent with disabling pain). Plaintiff did complain of leg pain in April through June of 2003, but there is no indication that plaintiff sought treatment for this pain after June of 2003. *See Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (per curiam) (failure seek treatment inconsistent w/allegations of pain).

AO72A
(Rev. 8/82)

After complaining of back pain in June of 2003, plaintiff underwent an MRI of the lumbar spine which revealed degenerative disc disease with some mild bulging at the lower two levels with no significant central or foraminal stenosis. Dr. Cheyne started plaintiff on a Medrol-Dosepak, instructed her to take hot showers or bathes twice a day and to stay active but to be protective of her back. There is no indication that plaintiff sought treatment for back pain again. In fact, at the administrative hearing in October of 2003, plaintiff testified that she was scheduled for a second epidural steroid injection but was going to cancel the appointment because she did not feel that she needed the second injection. Thus, while plaintiff may indeed have an injury to her back and experience some degree of pain, the medical evidence indicates that her condition is not of a disabling nature. *See Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir. 1997) (upholding ALJ's determination that claimant was not disabled even though she had in fact sustained a back injury and suffered some degree of pain).

Plaintiff has also sought treatment for chest pain on occasion during the relevant time period. In June of 2001 and EKG was normal. (Tr. 279). After complaining of chest pain, on September 22, 2003, plaintiff underwent a myocardial perfusion study which showed a normal stress test, a normal gated SPECT study, no evidence of perfusion defects in any segment of the left ventricle during stress or rest and an ejection fraction of sixty-three percent. (Tr. 437-438) Plaintiff also underwent the CT scan on October 13, 2003, and the results were normal. (Tr. 458). Plaintiff's treating physicians have placed no limitations on plaintiff's activities due to chest pain. Based on the record as a whole, we find substantial evidence supporting the ALJ's determination that plaintiff does not have disabling chest pain.

22

The record establishes that the main reason plaintiff was originally found to be disabled was because she met the Listing 12.04. A review of the record established that since May of 1998, plaintiff has not sought treatment from a mental health professional. *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability). Plaintiff did complain of experiencing depression to her treating physicians but in July of 2002, plaintiff reported to Dr. Jennings that Zoloft was helping to relieve her symptoms. Further, at both examinations with Dr. Walz plaintiff reported that she sometimes experienced depression but the medication was helping. Plaintiff also reported having many friends, being able to perform household chores, plant flowers, do crafts, watch television and read. After reviewing the entire record we find substantial evidence supporting the ALJ's determination that plaintiff does not have disabling depression.

Plaintiff has also been diagnosed with borderline intellectual functioning. The ALJ discussed plaintiff's borderline intellectual functioning and made adjustments to plaintiff's RFC to account for these limitations.

Plaintiff's subjective complaints are also inconsistent with evidence regarding her daily activities. Plaintiff testified that on an average day, she cleans her house, walks her dog, watches television, works on plastic canvas and colors in coloring books. Plaintiff testified that she usually goes to church every Sunday but noted she had not gone for the past two or three weeks. Plaintiff testified she also reads the Bible and Christian books. Plaintiff also goes to visit friends and has friends come to her house to visit. Plaintiff also thought if she could find a job she would be able to work part-time.

23

In both March of 2002, and February of 2003, plaintiff reported to Dr. Walz that she did not need assistance with her activities of daily living and that she cleans her home when she is not tired. Plaintiff reported in February of 2003, that she planned to plant some flowers when the weather turned warmer. To pass the time, plaintiff reported she worked puzzle books, colored, did sewing crafts, worked with plastic canvas and watched television. She also reported in March of 2002 that she went to help her husband's 84 year old cousin a couple of times a week. This level of activity belies plaintiff's complaints of pain and limitation and the Eighth Circuit has consistently held that the ability to perform such activities contradicts a plaintiff's subjective allegations of disabling pain. See *Cruze v. Chater, 85 F.3d 1320, 1324 (8th Cir.1996)* (mowed lawn, shopped, odds jobs and visits town); *See Hutton v. Apfel*, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimant's application supported by substantial evidence where daily activities– making breakfast, washing dishes and clothes, visiting friends, watching television and driving-were inconsistent with claim of total disability); *See Polaski* at 1322. Furthermore, she told Dr. Walz " I think I could probably go to work if I wanted to. I do [not] think there [is] anything to keep me from working."

The ALJ also considered the testimony of plaintiff's husband. After hearing his testimony, however, the ALJ properly concluded that his testimony was not fully credible. As the testimony of family members and friends need only be given consideration and need not be considered credible, the ALJ properly discredited the testimony of the witnesses. *Lawrence v. Chater*, 107 F.3d 674, 677 (8th Cir. 1997).

Therefore, although it is clear that plaintiff suffers with some degree of pain, she has not established that she was unable to engage in any gainful activity. *See Craig v. Apfel*, 212 F.3d

AO72A
(Rev. 8/82)

433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability). Neither the medical evidence nor the reports concerning her daily activities for the relevant time period support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

We next turn to the ALJ's assessment of plaintiff's RFC. It is the ALJ's responsibility to determine a claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and a claimant's own description of her limitations. 20 C.F.R. §404.1596; *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995); *Reed v. Sullivan*, 988 F.2d 812, 815-16 (8th Cir. 1993). The ALJ found plaintiff maintains the RFC to lift twenty-five pounds frequently, fifty pounds occasionally; to push/pull the same amounts; to sit, stand and walk a total of six hours each in an eight-hour workday with regular breaks. The ALJ further found plaintiff must avoid working at unprotected heights and around unprotected moving machinery. From a mental standpoint, the ALJ found plaintiff can understand, remember and carry out more detailed instructions with some limitations; and that she is limited to unskilled work, as defined by the ability to perform work where interpersonal contact is incidental to work performed, complexity of tasks is learned and performed by rote with few variables and little judgment and supervision is simple, direct and concrete. Plaintiff's capacity to perform this level of work is also supported by the fact that plaintiff's physicians placed no restrictions on plaintiff's activities during the relevant time period. *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of

AO72A
(Rev. 8/82)

total disability).  Based on our above discussion of the medical evidence and plaintiff's daily activities, we believe substantial evidence supports the ALJ's RFC assessment.

Finally, we look to the ALJ's determination that plaintiff could perform substantial gainful employment within the national economy.  We find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).  Accordingly, we find that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that plaintiff is not disabled as she is able to perform her past relevant work as an inspector at a furniture factory.  *See Pickney*, 96 F.3d at 296 (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**Conclusion:**

Based on the foregoing, we recommend, affirming the ALJ's decision, and dismissing plaintiff's case with prejudice.  **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of February 2006.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE

26